IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEIDRE SWEENEY, | ) | CASE NO. 1:18-cv-01077 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Deidre Sweeney ("Plaintiff" or "Sweeney") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his applications for social security disability benefits. Doc. 3. This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 12.

For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

On August 12, 2015, Sweeney filed applications for disability insurance benefits ("DIB")

and supplemental security income ("SSI"). Tr. 17, 130, 131, 224-229, 230-231. Sweeney

alleged a disability onset date of May 11, 2015. Tr. 17, 224, 230. She alleged disability due to

back injury, foot drop, severe nerve damage to L5, severe anxiety, depression and possible

PTSD. Tr. 100, 115, 166, 174, 277. After initial denial by the state agency (Tr. 166-171) and

denial upon reconsideration (Tr. 174-178), Sweeney requested a hearing (Tr. 179-181). A

hearing was held before an Administrative Law Judge ("ALJ") on June 30, 2017. Tr. 35-91. On

November 16, 2017, the ALJ issued an unfavorable decision (Tr. 14-34), finding that Sweeney

had not been under a disability within the meaning of the Social Security Act from May 11, 2015, through the date of the decision (Tr. 18, 30). Sweeney requested review of the ALJ's decision by the Appeals Council. Tr. 220-223. On March 12, 2018, the Appeals Council denied Sweeney's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence[1]

### A. Personal, vocational and educational evidence

Sweeney was born in 1985 and she was 31 years old at the time of the hearing. Tr. 43, 224. At the time of the hearing, Sweeney was living in a house with her two minor children, ages 3 and 13. Tr. 41-42. Sweeney also had an 11-year old son who was temporarily staying with his father because her son had medical issues that Sweeney was unable to take proper care of due to her medical conditions.[2] Tr. 42-43, 82-83. Sweeney and her husband were separated. Tr. 45. Sweeney graduated from high school. Tr. 43. After high school, Sweeney attended cosmetology school and phlebotomy school. Tr. 43. Sweeney obtained an advanced cosmetologist license and received a phlebotomist certificate. Tr. 43. She also attended some college classes but did not graduate from college. Tr. 43.

Sweeney's past work included work as a phlebotomist at the Cleveland Clinic. Tr. 49-51. Also, prior to working at the Cleveland Clinic, Sweeney worked at Toys R Us as a retail sales clerk, performing cashier and customer service duties. Tr. 52-53.

### B. Medical evidence

#### 1. Treatment history

---

[1] Plaintiff does not challenge the ALJ's findings regarding her mental health impairments. Doc. 14, p. 3, n. 1. Thus, the evidence summarized herein is related primarily to Sweeney's allegations regarding her physical impairments.

[2] Sweeney's two older children have a different father than her youngest child. Tr. 76-77.

An MRI of Sweeney's pelvis was taken on January 27, 2015.  Tr. 521-522.  The impression was a 2 cm left L5/S1 neuroforaminal soft tissue mass with imaging features consistent with a peripheral nerve sheath neoplasm (schwannoma)[3] and a 1 cm thinly septated right lower pole renal cyst partially seen.  Tr. 521.  An MRI of the lumbar spine was taken on February 20, 2015.  Tr. 519-520.  The findings were suggestive of left L5 nerve schwannoma with widening of the L5-S1 left neural foramen and bone remodeling.  Tr. 519-520.

Sweeney was scheduled for a tumor resection to be performed by Dr. Schlenk at the Cleveland Clinic on May 13, 2015.  Tr. 420.  During a pre-operative visit on May 11, 2015, (Tr. 420-425), Sweeney relayed having low back pain radiating into her left leg.  Tr. 421.  On physical examination, Sweeney exhibited decreased sensation in her left lower extremity and decreased limb weakness in her left lower extremity (4/5).  Tr. 425.

On May 13, 2015, Sweeney was admitted for her surgery.  Tr. 384-385, 419.  Dr. Schlenk performed a left L5 hemilaminectomy, complete facetectomy at L5-S1, and resection of extradural L5 nerve root tumor with frozen permanent specimens.  Tr. 384.  An MRI of Sweeney's lumbar spine was taken on May 19, 2015.  Tr. 509-510.  The impression was post-surgical changes from the resection of the left L5 schwannoma resulting in mass effect on the thecal sac at L5-S1 with overall mild narrowing of the spinal canal and displacement of the descending left nerve roots and fluid collection adjacent to the surgical site.  Tr. 509-510.  On May 20, 2015, Sweeney underwent a surgical procedure for revision and exploration of the lumbar posterior surgical wound and insertion of a lumbar drain.  Tr. 406.  Her preoperative diagnosis was "[h]istory of resected left L5 partial intradural schwannoma; persistent low

---

[3] "A schwannoma is a type of nerve tumor of the nerve sheath.  It's the most common type of benign peripheral nerve tumor in adults."  https://www.mayoclinic.org/diseases-conditions/schwannoma/cdc-20352974 (last visited 5/29/2019).

pressure headaches consistent with postoperative cerebrospinal fluid leak." Tr. 406. The procedure showed no obvious source of leak. Tr. 409. Sweeney received physical therapy while admitted and did well. Tr. 419. She was discharged on May 23, 2015, in improved condition with instructions for physical therapy and medications. Tr. 419-420.

Sweeney had a physical therapy evaluation on June 15, 2015, for her back pain and foot drop. Tr. 378-380. Sweeney explained that her biggest problems were her lower leg pain and foot drop. Tr. 378. She reported mild back pain and leg discomfort but indicated that was not as big a concern as her lower leg. Tr. 378. Walking long distances caused Sweeney's foot drop to get worse. Tr. 378. The physical therapist's assessment was "lower leg weakness/coordination deficit with hypersensitivity [due to] lumbar surgery/nerve irritation. Prognosis is good due to good overall health status." Tr. 379. Sweeney attended additional physical therapy sessions through August 6, 2015. Tr. 365, 371-372, 375-376, 377.

Sweeney saw Dr. Schlenk and Rachel Waite, CNP, for a visit on July 2, 2015. Tr. 374-375. Sweeney relayed that she had been having increased left leg pain after her physical therapy sessions and her legs were aching more in the evening. Tr. 374. Because of her leg pain, Sweeney was having trouble sleeping. Tr. 374. She also reported increased back pain, noting she felt pressure on her back with walking and sitting and the left side of her back hurt. Tr. 374. Overall, her pain was less frequent than before her surgery but when she had pain it was worse than it was before surgery. Tr. 374. Sweeney's left foot was very sensitive to touch. Tr. 374. She was taking Lyrica which helped. Tr. 374. Sweeney's foot still dropped when she was fatigued but she reported that her foot drop was much improved. Tr. 375. On physical examination, decreased sensation over the left lateral calf was noted. Tr. 375. Otherwise, the examination findings were unremarkable. Tr. 375. The impression was that Sweeney was status

post L5 hemilaminectomy, complete facetectomy at L5-S1; resection of extradural L5 nerve root tumor; status post revision and exploration of lumbar posterior surgical wound; left foot drop was significantly improved; and still with left L5 fairly significant radicular pain especially at the calf and foot. Tr. 375. Sweeney's Lyrica was refilled and it was recommended that Sweeney continue with physical therapy; have standing x-rays taken; and try Lidoderm patches for her nighttime foot pain. Tr. 375. The lumbar x-rays showed "absent left L5 pedicle likely a combination of postsurgical change and chronic erosion related to previously resected nerve sheath tumor. Findings consistent with May 19 MRI. Curvature and alignment are normal. No subluxation or compression. Disc heights maintained. Visualized bony pelvis normal." Tr. 503-504.

During a July 28, 2015, physical therapy session, Sweeney relayed that she had returned to work three weeks prior for two weeks. Tr. 372. She noted increased worsening of her lower leg pain, more drop foot and more back pain. Tr. 372. She indicated that, prior to returning to work, she was having less pain. Tr. 372. She had been off work for about a week and was tentatively off work for another month. Tr. 372. Sweeney was wearing an AFO (ankle foot orthosis). Tr. 372. Sweeney was advised that she needed to continue with weight-bearing walking as tolerated and to continue working on sensitivity issues with habituation (light and pressure). Tr. 372. She was informed that pain management might be required if her sensitivity continued and she should establish a new patient-physician relationship if her surgeon would not continue to see her post-90 days of surgery. Tr. 372.

On August 4, 2015, Sweeney saw Dr. Steven Assalita, M.D.,[4] at the Cleveland Clinic for an internal medicine follow up. Tr. 36-370. Sweeney had been attending physical therapy but

---

[4] Dr. Assalita was a resident physician in internal medicine. Tr. 371. The attending physician was Mahesh Manne, M.D. Tr. 371.

her pain and neurological symptoms had been progressing. Tr. 369. Sweeney relayed that, after trying to return to work, she noticed that her left foot started hurting/aching. Tr. 369. She indicated that, "[w]hen her foot is 'exhausted' the pain is excruciating due to hyperactivity to touch." Tr. 369. Functionally, Sweeney indicated she was able to support weight and she did not have weakness in her leg, which was an improvement from before surgery. Tr. 369. Sweeney reported being very anxious. Tr. 369. She was not sleeping well. Tr. 369. Dr. Assalita diagnosed adjustment disorder with depressed mood; generalized anxiety disorder; history of laminectomy; left foot drop; and neuropathic pain. Tr. 370. Dr. Assalita commented that Sweeney had "significant worsening of symptoms after laminectomy, no clear plan from neurosurgery notes." Tr. 370.

Sweeney had an MRI of her lumbar spine taken on September 13, 2015. Tr. 756-763. The impression was:

> Resolution of the left-sided dorsal epidural fluid collection since 5/19/15 with small amount of enhancing likely granulation tissue in this location. Resolved mass effect on the thecal sac. Finding is contiguous with enhancing tissue, also likely granulation tissue, extending into the expanded left L5-S1 neural foramina and into the left dorsal paraspinal muscles. This tissue encases the exiting left L5 nerve root and partially encases the descending left S1 nerve root.

Tr. 763.

On October 26, 2015, Sweeney underwent a functional capacity evaluation at the Cleveland Clinic which was conducted by occupational therapist Ernest Michaud. Tr. 831-837.[5] The functional capacity evaluation is summarized below under the opinion evidence section.

On December 1, 2015, Sweeney saw a Cleveland Clinic pain management physician, Benjamin Abraham, M.D., at Marymount Hospital for evaluation of her pain. Tr. 856-866. Sweeney's chief complaint was "pain in my left leg and left foot." Tr. 856. Sweeney described

---

[5] The functional evaluation is also located in the record at Tr. 727-733.

the pain as aching and constant and she rated her pain a 9 out of 10. Tr. 856. Sweeney relayed that her pain was exacerbated by "walking and sitting up to[o] long" and mitigated by "taking [her] shoe off and laying down." Tr. 856. Sweeney was taking Aleve for her pain. Tr. 856. On physical examination, Dr. Abraham observed normal and symmetric bilateral upper and lower extremity strength; no atrophy or tone abnormalities; straight leg raising in sitting and supine position negative for radicular pain; pain to palpation in the lumbar spinal muscles; positive facet loading positive bilaterally; full range of motion in the peripheral joint extremities; left foot drop; allodynia in the left pretibial region; no instability or laxity in all four extremities; no deformities, edema, or skin discoloration; good capillary refill; an antalgic gait with walker; muscle stretch reflexes were +3 at the patella on the left, otherwise symmetric; and no loss of sensation. Tr. 860-861. Dr. Abraham noted the following diagnoses – neuropathy; lumbosacral spondylosis with radiculopathy; sickle cell trait; lumbar spinal cord injury; and alcoholism in remission. Tr. 861. Dr. Abraham made some adjustments to Sweeney's medications and recommended that Sweeney return for a follow up in four weeks. Tr. 862.

Sweeney saw Dr. Abraham for follow up on January 12, 2016. Tr. 867-873. Sweeney described her left ankle pain as aching and she rated her pain a 6 out of 10. Tr. 867. Sweeney indicated that her pain was worse when she performed "activity." Tr. 867. On physical examination, Dr. Abraham observed normal and symmetric bilateral upper and lower extremity strength; no atrophy or tone abnormalities; negative straight leg raising; pain to palpation over the lumbar paraspinal muscles; positive facet loading bilaterally; good capillary refill; antalgic gait; intact upper and lower extremity coordination bilaterally; muscle stretch reflexes physiologic and symmetric; and no loss of sensation. Tr. 868. Dr. Abraham indicated that Sweeney was markedly improved with Lyrica, Effexor, and Mobic and it was okay for her to

continue with those. Tr. 868. Also, Dr. Abraham added a cream. Tr. 868. Diagnoses were schwannoma of spinal cord and sickle cell trait. Tr. 868.

Sweeney saw Dr. Assalita on April 4, 2016, for a follow-up visit. Tr. 895-902. Sweeney reported some improvement over the prior few months, mostly with her depression, but she also had some improvement in her neuropathic pain. Tr. 895. She was continuing to use a brace for her foot drop. Tr. 895. Sweeney had not followed up with psychology to get an appointment with a psychologist. Tr. 895. A new referral was provided. Tr. 895. She was attending AA meetings multiple times per week. Tr. 895. Sweeney reported having a seizure in March. Tr. 895. Sweeney was seen at the emergency room for her seizure. Tr. 950-954. Sweeney had seizures in the past and she was scheduled for a neurology follow up. Tr. 895. She also had a right leg laceration, which Dr. Assalita noted was healing well. Tr. 897. Due to Sweeney's neuropathy, Dr. Assalita continued Sweeney's handicap placard. Tr. 897. Sweeney was seen in April 2016 and July 2016 by the neurology department at the Cleveland Clinic. Tr. 903-910, 955-965. During the July 2016 appointment, the PA seeing Sweeney noted that Sweeney's seizures might be related to her menstrual cycle and recommended that Sweeney see her OB/GYN to discuss birth control which could decrease/eliminate Sweeney's catamenial seizures. Tr. 958. Physical examination findings from the July 2016 neurology appointment included no edema in extremities; normal strength in the extremities with the exception of the left lower extremity, noted as 4/5 (left foot drop); normal tone; intact sensation to light touch; and abnormal gait due to drop foot on left (with a brace being worn). Tr. 958.

    **2. Opinion evidence**

        **a. Occupational therapist functional capacity evaluation**

As noted above, on October 26, 2015, Sweeney underwent a functional capacity evaluation at the Cleveland Clinic which was conducted by occupational therapist Mr. Michaud. Tr. 831-837. Sweeney's chief complaint was sensitivity on the left foot. Tr. 832. She also complained of pain in the low back area, primarily on the left side. Tr. 832. At the start of the evaluation, Sweeney reported a pain level of 8 out of 10. Tr. 832. At the conclusion of the evaluation, Sweeney reported a pain level of 9 out 10, noting that she was looking forward to getting home and lying down for a few hours. Tr. 832.

Sweeney tolerated a combined total of 35 minutes of standing and walking during the evaluation and she reported an increase in symptoms with prolonged standing and/or walking. Tr. 832. She tolerated 10 minutes of uninterrupted standing and 5 minutes of uninterrupted walking. Tr. 832. Sweeney was not using a walker or cane and reported that she did not normally use either one. Tr. 832. Sweeney was able to tolerate a total of 65 minutes of sitting during the evaluation, 35 minutes uninterrupted. Tr. 833. Sweeney indicated that getting up and moving around helped alleviate her symptoms to some extent but lying down flat for several hours during the day is how Sweeney relieved her symptoms during the day. Tr. 833. As far as lifting/carrying and pushing/pulling restrictions, Mr. Michaud found that Sweeney could perform: frequent lower lifting with two hands – zero pounds; occasional lower lifting with two hands – 12 pounds;[6] occasional carry/lift using two hands – 7 pounds; occasional upper lifting using two hands – 7 pounds; and occasional pushing and pulling a sled using two hands – 10 pounds.[7] Tr. 833-834.

---

[6] On her first lower lifting attempt, Sweeney attempted 16 pounds. Tr. 833.

[7] On her first pushing/pulling attempt, Sweeney attempted 18 pounds. Tr. 833-834.

Mr. Michaud summarized his evaluation, stating that Sweeney had limitations in lifting, carrying, pushing, pulling and ambulation. Tr. 835. Sweeney's primary issues were pain from her lower left back into the left foot dorsally, with her left foot weakened and having a somewhat limited arc of active dorsiflexion (partial foot drop). Tr. 835. Mr. Michaud noted that Sweeney complained of intolerance to pressure from her shoe on the dorsal left foot. Tr. 835. Mr. Michaud concluded that, based on Sweeney's performance during the evaluation, she fell under the physical demand classification of less than sedentary, which he explained involved occasional lifting of 10 pounds, frequent lifting of a negligible amount of weight, and constant lifting of a negligible amount of weight over the course of a typical workday. Tr. 835.

### b. Reviewing physicians

On September 9, 2015, state agency reviewing physician Anne Prosperi, D.O., completed a Physical RFC Assessment. Tr. 108-110. Dr. Prosperi opined that Sweeney could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk 4 hours; and sit about 6 hours in an 8-hour workday. Tr. 108. Dr. Prosperi opined that Sweeney's ability to push and/or pull was limited in her left lower extremity – she could not operate foot controls on the left due to foot drop. Tr. 108. Dr. Prosperi opined that Sweeney could never climb ladders/ropes/scaffolds due to foot drop; she could occasionally climb ramps/stairs, stoop, and crawl; and she could frequently balance, kneel, and crouch. Tr. 108-109. Dr. Prosperi opined that Sweeney would need to avoid unprotected heights and work around hazardous moving machinery. Tr. 109.

Upon reconsideration, on January 15, 2016, state agency reviewing physician Michael Hallett, M.D., completed a Physical RFC Assessment. Tr. 140-142. Dr. Hallett opined that Sweeney could occasionally lift and/or carry 10 pounds; frequently lift and/or carry 10 pounds;

stand and/or walk 2 hours; and sit about 6 hours in an 8-hour workday.  Tr. 141.  Dr. Hallett

opined that Sweeney's ability to push and/or pull was limited in her left lower extremity – she

could not operate foot controls on the left due to foot drop.  Tr. 141.  Dr. Hallett opined that

Sweeney could never climb ladders/ropes/scaffolds due to foot drop; she could occasionally

climb ramps/stairs, stoop, and crawl; and she could frequently balance, kneel, and crouch.  Tr.

141.  Dr. Hallett opined that Sweeney would need to avoid unprotected heights and work around

hazardous moving machinery.  Tr. 142.

**C.**     **Testimonial evidence**

    **1.**     **Plaintiff**

Sweeney was represented and testified at the hearing.  Tr.  37, 41-83.

Around her alleged onset date of May 11, 2015, Sweeney found out she had a tumor in

her lower spine area and she had to have it removed surgically.  Tr. 47.  She had to have a

subsequent surgery to address a fluid leak.  Tr. 47.  Also, during that time, Sweeney was

informed that she had nerve damage to the point of a foot drop.  Tr. 47.  She tried physical

therapy but her foot drop worsened and physical therapy became too painful.  Tr. 47-48.

Sweeney then started pain management.  Tr. 48.  She tried to return to work but it was too

painful.  Tr. 48.  Her attempt to return to work following her alleged onset date lasted only one

week.  Tr. 48-49.

Sweeney was using a walker at the hearing.  Tr. 78.  The walker was prescribed for

Sweeney by one of her doctors.  Tr. 80.  She uses the walker when she is not using her foot

brace, when she is feeling really bad, or when she has to make a long trip somewhere.  Tr. 78-80.

Sweeney estimated using her walker about once per week.  Tr. 79-80.  Sweeney also has a cane

as well as pull-ups to help her put her socks on and claws to grab things down.  Tr. 80-81.

Sweeney does not have a shower chair but, if she needs a chair in the shower, she will bring one in and there are railings in her shower. Tr. 81.

When the ALJ asked Sweeney what prevented her from working full time, Sweeney indicated it bothers her to stand or sit. Tr. 56-57. She noted her failed attempt to go back to work. Tr. 57. Sweeney also indicated she had a physical capacity test performed at the Cleveland Clinic to see if she was qualified to go back to work. Tr. 57. She did not pass the test and felt it was extremely painful. Tr. 57. Sweeney also indicated she was dealing with mental health issues and alcoholism. Tr. 58. Sweeney indicated she had been sober since August 24, 2015. Tr. 59, 71. After becoming sober, she was concerned about continuing to use narcotic pain medication, so she stopped using any narcotics. Tr. 58-59. As a result, her pain level increased. Tr. 59. Sweeney has seizures which she believes are stress induced. Tr. 59-50. Sweeney attends counseling for her mental health issues and she participates in a Cleveland Clinic program for her seizures. Tr. 59-60, 74-75.

Sweeney explained that her left foot drop keeps her from being able to stand for a long time and it makes it difficult for her to walk. Tr. 61. Sweeney has neuropathy that causes pain to shoot up her left side, from her foot into her lower back. Tr. 61. Wearing her shoe and brace causes her pain on her entire left side from her hip downward. Tr. 61. To try to address the issue, Sweeney has to change positions from standing to sitting and elevating her leg helps sometimes. Tr. 61. Otherwise, she takes over-the-counter medication – either Tylenol or Advil. Tr. 62. Sweeney's doctors have recommended narcotics but she does not want to take them and her doctors have recommended a possible surgery but, at Sweeney's age, the doctors feel that the risks did not outweigh the benefits. Tr. 62. Sweeney's doctors explained to her that, if she had the recommended surgery now, she would have to have it again when she was 50. Tr. 62.

Therefore, the surgeon recommended that Sweeney just wait to have the surgery when she is in her 50s.  Tr. 62.

Because of her back problems, if Sweeney sits too long, she will have pain.  Tr. 63.  She has to adjust how she is sitting, stand up or lie down.  Tr. 63.  Physical therapy was making her pain worse so she stopped.  Tr. 63.  Sweeney spends about 12 hours each day lying down.  Tr. 76.  She is not sleeping the entire time but needs to be in a more comfortable position.  Tr. 76.

Although she is separated from her husband, Sweeney's husband comes over to her house to help with her household chores.  Tr. 45.  He helps her with grocery shopping, laundry, yardwork, cooking, and taking care of their three-year old daughter.  Tr. 64-66, 76-77.  Her husband comes over to her house daily.  Tr. 65.  Sweeney can straighten up around the house, i.e., pick things up, but her husband does the cleaning.  Tr. 65.  Sweeney is able to bathe her three-year old but noted that her three-year old is able to get in and out of the bath tub herself and is more self-sufficient than one would think a three-year old would be.  Tr. 66-67.  Sweeney's three-year old weighs around 20 pounds.  Tr. 67.  Sweeney is able to lift her but Sweeney usually hurts her back if she tries to pick her up or carry her.  Tr. 68.

During the day, Sweeney spends time with her three-year old watching shows or coloring.  Tr. 70.  She will go outside and let her daughter run around.  Tr. 70.  Sweeney has a deck she can sit out on and let her daughter play and let their dog run around.  Tr. 70.  Sweeney mostly stays around home.  Tr. 70.  She does leave her house to attend AA meetings.  Tr. 70-71.

2.     **Vocational expert**

The Vocational Expert Thomas Nimberger ("VE") testified at the hearing.  Tr. 54, 55-56, 83-89.  The VE described Sweeney's past work.  Tr. 84.  The phlebotomist position was a light,

semi-skilled job performed by Sweeney at the light level. Tr. 84. The retail sales clerk position was a light, semi-skilled job performed by Sweeney at the medium level. Tr. 85.

The ALJ asked the VE to assume an individual of Sweeney's age, education and work experience who could perform a full range of sedentary work; never use foot controls with the left lower extremity; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance, kneel and crouch; occasionally stoop and crawl; never be exposed to hazards; limited to simple, routine, and repetitive tasks but not at a production-rate pace; have occasional interaction with supervisors, coworkers, and the public; and limited to routine workplace changes. Tr. 85. The VE indicated that the described individual would be unable to perform Sweeney's past work but there would be other work that the individual could perform, including polisher, mailing house worker, and document preparer. Tr. 85-86. The VE provided national job incidence data for each of the identified jobs. Tr. 86.

Sweeney's counsel asked the VE to consider the ALJ's hypothetical but to add that, after sitting for about 30 minutes, the individual would have to stand up for about 5 minutes or so before they could sit again for another 30 minutes. Tr. 86. The VE indicated that his answer to the first hypothetical would not change. Tr. 87.

Sweeney's counsel asked the VE whether his answer would change if the hypothetical was the same as the first one but with the additional limitation of needing a walker for ambulation. Tr. 87. The VE indicated that his answer would be the same. Tr. 87.

Sweeney's counsel then asked the VE whether an individual described in the first hypothetical would be able to perform the jobs identified if, while the individual was seated, she would need to keep her left leg elevated to a 90-degree angle. Tr. 87-88. The VE indicated that such a limitation would not allow for performance of the jobs identified. Tr. 88.

Sweeney's counsel also asked the VE whether his prior answer regarding the jobs available to the individual described in the first hypothetical would change if the individual was limited to lifting and carrying a maximum of seven pounds rather than ten pounds as indicated in the first hypothetical. Tr. 88. The VE indicated that there would be no jobs available. Tr. 88.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[8] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

impairment,[9] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[10] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her November 16, 2017, decision the ALJ made the following findings:[11]

1.      Sweeney meets the insured status requirements of the Social Security Act through June 30, 2015. Tr. 19.

2.      Sweeney has not engaged in substantial gainful activity since May 11, 2015, the alleged onset date. Tr. 19.

3.      Sweeney has the following severe impairments: disorder of the spinal cord, left foot drop, neuropathy, seizures, anxiety disorder, depressive disorder, and alcohol abuse disorder. Tr. 19-20.

---

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[10] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[11] The ALJ's findings are summarized.

4.      Sweeney does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 20-22.

5.      Sweeney has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except never use foot controls with the left lower extremity; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance, kneel, and crouch; occasionally stoop and crawl; never be exposed to hazards; limited to perform simple, routine, and repetitive tasks, but not at a production rate pace; can have occasional interaction with supervisors, coworkers, and the public; and limited to routine workplace changes. Tr. 22-28.

6.      Sweeney is unable to perform any past relevant work. Tr. 28.

7.      Sweeney was born in 1985 and was 29 years old, defined as a younger individual age 18-44, on the alleged disability onset date. Tr. 28.

8.      Sweeney has at least a high school education and is able to communicate in English. Tr. 28.

9.      Transferability of job skills is not material to the determination of disability. Tr. 28.

10.     Considering Sweeney's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Sweeney can perform, including polisher, mailing house worker, and document preparer. Tr. 29-30.

Based on the foregoing, the ALJ determined Sweeney had not been under a disability, as defined in the Social Security Act, from May 11, 2015, through the date of the decision. Tr. 30.

## V. Plaintiff's Arguments

Sweeney argues that the ALJ failed to perform a proper pain analysis. Doc. 14, pp. 8-11. She also argues that the ALJ erred with respect to the weight assigned to the functional capacity evaluation completed by occupational therapist Ernest Michaud. Doc. 14, pp. 11-14.

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.** **The ALJ properly evaluated Sweeney's subjective statements regarding her symptoms**

Sweeney argues that the ALJ failed to perform a proper pain analysis. A claimant's statements of symptoms alone are insufficient to establish the existence of a physical or mental impairment or disability. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304.[12] When a

---

[12] SSR 16-3p replaces SSR 96-7p and applies to rulings on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. The use of the term "credibility" was eliminated to "clarify that subjective symptoms evaluation is not an examination of an individual's character." *Id.* at * 2.

claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms. 20 C.F.R. § 404.1529(c); 2017 WL 5180304, * 2-8.

First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g*., pain. SSR 16-3p, 2017 WL 5180304, * 3-4. Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities. *Id.* at * 3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, and other relevant evidence. SSR 16-3p, 2017 WL 5180304, * 4-8. In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered. *Id.* at *7-8. Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. *Id.* The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at * 10.

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

In arguing that the ALJ did not perform a proper pain analysis, Sweeney asserts that there is objective evidence to support a disability level of pain and that the ALJ did not properly consider the location, duration, frequency, and intensity of pain or symptoms and activities of daily living.   Following these conclusory arguments, Sweeney summarizes evidence that she asserts should have been the basis for finding her impairments to be more limiting than the ALJ found them to be.

As the decision makes clear, the ALJ considered the evidence in detail.  The ALJ considered Sweeney's subjective statements; evidence regarding Sweeney's surgery; evidence regarding her brace; evidence regarding her treatment, which included physical therapy and pain management; evidence regarding her foot drop; physical examination findings; types of medications used to treat her impairments; and evidence regarding daily activities.  Tr. 22-25, 26-27.  Having considered that evidence, the ALJ concluded that Sweeney's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence of record.  Tr. 23, 26-27.

The ALJ's RFC limits Sweeney to sedentary level work with left foot control and postural and environmental restrictions to account for her left foot drop and associated left leg and low back pain and to account for her potential seizure activity.  Tr. 22, 26-27.  Sweeney has not shown that the ALJ's assessment of her subjective statements regarding the limiting effects

of her pain or the ALJ's RFC assessment is unsupported by substantial evidence. Sweeney has not shown that the ALJ failed to consider evidence. And it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Furthermore, even if Sweeney could demonstrate that substantial evidence or indeed a preponderance of the evidence supported her position, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

For the reasons discussed herein, the Court finds that the ALJ did not err in assessing Sweeney's subjective statements regarding her symptoms. Accordingly, reversal and remand is not warranted.

## C.     The ALJ did not err in weighing the medical opinion evidence

Sweeney argues that the ALJ erred in giving great weight to the opinions of the state agency reviewing physicians and assigning only partial weight to the opinion of Mr. Michaud, an occupational therapist, who conducted a one-time functional capacity evaluation.

Not all medical sources are "acceptable medical sources." *See* 20 C.F.R. § 404.1513.[13] For example, nurse practitioners and therapists are medical sources but they are not considered "acceptable medical sources." 20 C.F.R. § 404.1513(d). Nevertheless, the opinion of a medical source who is not an "acceptable medical source" but who has seen a claimant in his professional capacity is relevant evidence. SSR 06-03p, 2006 WL 2329939, * 6 (August 9, 2006). SSR 06-03p provides guidance as to how opinions of medical sources who are not "acceptable medical sources" are to be considered, stating,

> Opinions from "other medical sources" may reflect the source's judgment about
> some of the same issues addressed in medical opinions from "acceptable medical

---

[13] Since Sweeney's claim was filed prior to March 26, 2017, the version of 20 C.F.R. § 404.1513 effective from September 3, 2013, to March 26, 2017, is the applicable version of the Regulation.

sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.

Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

SSR 06-03p, 2006 WL 2329939, * 5.

The ALJ discussed and explained the weight assigned to the functional capacity evaluation completed by Mr. Michaud and the opinions of the state agency reviewers, stating

For the above summarized reasons, [ ] I afford partial weight to the assessment of Mr. Michaud. While not an acceptable medical source, he nonetheless had the opportunity to evaluate the claimant in person. Further, the evidence supports that the claimant was limited to a less than sedentary exertional level. However, he did not account for the claimant's postural and left foot limitations, as outlined above, or her subsequent seizure activity. However, for these reasons, I afford great weight to the assessment of the State agency medical consultants, Anne Prosperi, DO and Michael Hallett, MD (1A, 2A, 5A, 6A). While Dr. Prosperi noted a slightly greater ability for walking/standing, both consultants noted findings more consistent with a sedentary exertional level. Further, as noted above, the evidence supports their assessed limitations for use of left foot controls, postural limitations related to her left foot drop and lumbar pain, and hazard limitation, which would account for her seizure activity (7F/1-8, 8F/10-14, 8F/30-34, 9F/36-40, 10F/1-5).

Tr. 27.

Although not an acceptable medical source, consistent with the Regulations and SSR 06-03p, the ALJ considered Mr. Michaud's opinion and clearly explained the weight assigned to his opinions and the reasons for that weight. Furthermore, the ALJ explained the reasons for assigning great weight to the state agency reviewers' opinions.

Sweeney has failed to demonstrate that the ALJ did not comply with the Regulations or SSR 06-03p when weighing the medical opinion evidence. Furthermore, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence in your case record." 20 C.F.R. §§

404.1545(a)(3), 404.1546(c). The ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1545 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009). In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

Mr. Michaud was not a treating source and not an acceptable medical source. He saw Sweeney only once. Notwithstanding the foregoing, the ALJ considered Mr. Michaud's opinion and the opinions of the state agency reviewers in light of other evidence of record and sufficiently explained the weight assigned to those opinions. Having weighed the medical opinion evidence along with the other evidence of record, the ALJ assessed a restrictive RFC, sedentary exertional work with additional left foot control restrictions and postural and environmental limitations.

The undersigned finds that Sweeney has failed to show error with respect to the ALJ's evaluation or weighing of the opinions rendered by Mr. Michaud, Dr. Prosperi, or Dr. Hallett and she has not shown that the RFC is not supported by substantial evidence. Accordingly, reversal and remand is not warranted.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: May 29, 2019                          */s/ Kathleen B. Burke*
_____
                                             Kathleen B. Burke
                                             United States Magistrate Judge